1

2

3

4

5

6

7

8

# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARCOS PALOMAR, | Case No. 1:15-cv-01279-DAD-SAB-HC |
| Petitioner, | FINDINGS AND RECOMMENDATION RECOMMENDING DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS |
| v. | |
| RAYMOND MADDEN, | |
| Respondent. | |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Respondent declined magistrate judge jurisdiction and this matter was therefore referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302.

## I.

## BACKGROUND

On February 14, 2013, Petitioner was convicted after a jury trial in the Madera County Superior Court of oral copulation upon a child ten years or younger (count 1), lewd and lascivious acts upon a child fourteen years or younger (counts 2 and 3), and a lewd and lascivious act upon a child fourteen years or younger by use of force, violence, duress, menace, or threat of great bodily harm (count 4). (CT[1] 119–22). On May 3, 2013, Petitioner was

---

[1] "CT" refers to the Clerk's Transcript on Appeal lodged by Respondent on November 25, 2015. (ECF No. 15).

1  sentenced to a determinate term of sixteen years and a consecutive indeterminate term of fifteen
2  years to life. (CT 184–87).

3         On March 11, 2015, the California Court of Appeal, Fifth Appellate District, affirmed the
4  judgment with the exception of finding that the trial court erred in imposing a $750 presentence
5  report fee. People v. Palomar, No. F067273, 2015 WL 1089544, at *22 (Cal. Ct. App. Mar. 11,
6  2015). The California Supreme Court denied Petitioner's petition for review on June 17, 2015.
7  (LDs[2] 6, 7).

8         On August 20, 2015, Petitioner filed the instant federal petition for writ of habeas corpus.
9  (ECF No. 1). Therein, Petitioner raises the following claims for relief: (1) violation of his
10 Miranda rights; (2) erroneous omission of unanimity instruction with respect to count 1; (3)
11 insufficient evidence of force to support conviction on count 4; (4) erroneous application of an
12 amended sentencing scheme with respect to count 4; and (5) erroneous prohibition of defense
13 counsel's use of visual aid during closing argument. On November 23, 2015, Respondent filed
14 an answer. (ECF No. 14). Petitioner has filed a traverse and supplemental traverse. (ECF Nos.
15 19, 23).

16                                        **II.**

17                            **STATEMENT OF FACTS[3]**

18     [D]uring a period of about one year, defendant sexually abused his then nine- or
       ten-year-old daughter in their home. At trial, Jane Doe testified her father touched
19     her breasts and vagina on more than one occasion. In a forensic interview
       conducted shortly after her allegations surfaced, Jane told the interviewer
20     defendant had also pushed her head down and placed his penis in her mouth. The
       interview was played for the jury after Jane denied during her trial testimony that
21     conduct had occurred.

22     Defendant testified as well. He claimed he touched his daughter's breasts only in
       response to her complaints of pain in that area. Further, he stated he touched her
23     briefly on one occasion, over her clothing, to ensure she was wearing a sanitary
       napkin overnight because she was menstruating.
24
       With specific regard to the admissions of sexual contact with his daughter made
25     during an interview with Detective Mark Trukki several days after his arrest,
       defendant testified the only reason he admitted to placing his penis in his
26

---

27 [2] "LD" refers to the documents lodged by Respondent on November 25, 2015. (ECF No. 15).
   [3] The Court relies on the California Court of Appeal's March 11, 2015 opinion for this summary of the facts of the
28 crime. See Vasquez v. Kirkland, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009).

daughter's mouth was because Trukki told defendant before the recorded portion[4] of the interview began that only he (Trukki) could help get defendant out of jail, and such an admission was necessary for defendant to receive that help. Defendant further testified he "made up" the other admissions regarding sexual contact with his daughter as a way to further elicit Trukki's assistance. He testified he never placed his penis in his daughter's mouth nor did he ever touch her sexually as was alleged.

Palomar, 2015 WL 1089544, at *1–2.

## III.

## STANDARD OF REVIEW

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged convictions arise out of Madera County Superior Court, which is located within the Eastern District of California. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (en banc). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

Under the AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless a petitioner can show that the state court's adjudication of his claim:

---

[4] The California Court of Appeal stated with respect to Petitioner's conversation with law enforcement:

> Defendant testified he had a conversation with Detective Trukki before Trukki turned on the recording device. He says Trukki offered his assistance in exchange for defendant admitting he placed his penis in his daughter's mouth. That, defendant testified, is the reason he admitted to doing so. Nevertheless, when listening to the recording, one can plainly hear someone outside of the room saying "Hey, come in." A door opens and Detective Trukki asks the arriving individual whether he is "Marcos," and after receiving an affirmative reply, Trukki introduces himself and Detective Josh Chavez. Trukki then asks defendant to move in a little closer so they can "shut the door." Trukki thanks someone and the door can be heard closing. After review of this evidence, there is no reason to believe a conversation occurred between Trukki and defendant prior to the beginning of the audio recording.

Palomar, 2015 WL 1089544, at *2 n.2.

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Harrington v. Richter, 562 U.S. 86, 97–98 (2011); Lockyer v. Andrade, 538 U.S. 63, 70–71 (2003); Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71 (quoting 28 U.S.C. § 2254(d)(1)). In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id. In addition, the Supreme Court decision must "'squarely address [] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of review under AEDPA. Moses v. Payne, 555 F.3d 742, 754 (9th Cir. 2009) (quoting Wright v. Van Patten, 552 U.S. 120, 125 (2008)); Panetti v. Quarterman, 551 U.S. 930 (2007); Carey v. Musladin, 549 U.S. 70 (2006). If no clearly established Federal law exists, the inquiry is at an end and the Court must defer to the state court's decision. Musladin, 549 U.S. 70; Wright, 552 U.S. at 126; Moses, 555 F.3d at 760.

If the Court determines there is governing clearly established Federal law, the Court must then consider whether the state court's decision was "contrary to, or involved an unreasonable application of, [the] clearly established Federal law." Lockyer, 538 U.S. at 72 (quoting 28 U.S.C. § 2254(d)(1)). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412–13; see also Lockyer, 538 U.S. at 72. "The

word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.'" <u>Williams</u>, 529 U.S. at 405 (quoting Webster's Third New International Dictionary 495 (1976)). "A state-court decision will certainly be contrary to [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." <u>Id.</u> If the state court decision is "contrary to" clearly established Supreme Court precedent, the state decision is reviewed under the pre-AEDPA de novo standard. <u>Frantz v. Hazey</u>, 533 F.3d 724, 735 (9th Cir. 2008) (en banc).

"Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Williams</u>, 529 U.S. at 413. "[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." <u>Id.</u> at 411; <u>see also</u> <u>Lockyer</u>, 538 U.S. at 75–76. The writ may issue only "where there is no possibility fair minded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." <u>Richter</u>, 562 U.S. at 102. In other words, so long as fair minded jurists could disagree on the correctness of the state court's decision, the decision cannot be considered unreasonable. <u>Id.</u> If the Court determines that the state court decision is objectively unreasonable, and the error is not structural, habeas relief is nonetheless unavailable unless the error had a substantial and injurious effect on the verdict. <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993).

The court looks to the last reasoned state court decision as the basis for the state court judgment. <u>Stanley v. Cullen</u>, 633 F.3d 852, 859 (9th Cir. 2011); <u>Robinson v. Ignacio</u>, 360 F.3d 1044, 1055 (9th Cir. 2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision. <u>Edwards v. Lamarque</u>, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."

Richter, 562 U.S. at 99. This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely." Id. at 99–100 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).

Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). Stanley, 633 F.3d at 860; Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes, 336 F.3d at 853. While the federal court cannot analyze just what the state court did when it issued a summary denial, the federal court must review the state court record to determine whether there was any "reasonable basis for the state court to deny relief." Richter, 562 U.S. at 98. This court "must determine what arguments or theories ... could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Id. at 102.

## IV.

### REVIEW OF CLAIMS

#### A. **Miranda** Claim

In his first claim for relief, Petitioner asserts that he twice received defective Miranda warnings. (ECF No. 1 at 8).[5] Petitioner contends that the state court erred in denying his motion to suppress his statements based on defective Miranda admonitions and that counsel was ineffective in failing to preserve this claim for appeal. (Id. at 8–9). Respondent argues that Petitioner's Miranda claim is procedurally barred and the state court's rejection of Petitioner's ineffective assistance of counsel claim was not unreasonable or contrary to Supreme Court precedent. (ECF No. 14 at 15).

Petitioner's Miranda claim was raised on direct appeal to the California Court of Appeal, Fifth Appellate District, which found that Petitioner had forfeited the claim. Palomar, 2015 WL

---

[5] Page numbers refer to ECF page numbers stamped at the top of the page.

1089544, at *6. The claim also was raised in the petition for review, which the California Supreme Court summarily denied. (LDs 6, 7). Where "the last reasoned opinion on the claim explicitly imposes a procedural default, [the Court] will presume that a later decision rejecting the claim did not silently disregard that bar and consider the merits." Ylst, 501 U.S. at 803.

1. Procedural Default

A federal court will not review a petitioner's claims if the state court has denied relief on those claims pursuant to a state law procedural ground that is independent of federal law and adequate to support the judgment. Coleman v. Thompson, 501 U.S. 722, 729–30 (1991). This doctrine of procedural default is based on the concerns of comity and federalism. Id. at 730–32. However, there are limitations as to when a federal court should invoke procedural default and refuse to review a claim because a petitioner violated a state's procedural rules. Procedural default can only block a claim in federal court if the state court "clearly and expressly states that its judgment rests on a state procedural bar." Harris v. Reed, 489 U.S. 255, 263 (1989).

Here, the California Court of Appeal found that Petitioner failed to preserve his Miranda claim for appeal under California Evidence Code section 353(a) because Petitioner's stated grounds for objection at trial were different from the arguments he presented on appeal. Palomar, 2015 WL 1089544, at *5–6. As the California Court of Appeal clearly and expressly stated that its decision on the Miranda claim rests on a state procedural bar, procedural default is appropriate if the state procedural bar is independent and adequate.

To qualify as "independent," a state procedural ground "must not be 'interwoven with the federal law.'" Park v. California, 202 F.3d 1146, 1152 (9th Cir. 2000) (quoting Michigan v. Long, 463 U.S. 1032, 1040–41 (1983)). "To qualify as an 'adequate' procedural ground, a state rule must be 'firmly established and regularly followed.'" Walker v. Martin, 562 U.S. 307, 316 (2011) (quoting Beard v. Kindler, 558 U.S. 53, 60 (2009)). The Ninth Circuit has taken a burden-shifting approach to determining the adequacy of a state procedural ground. See Bennett v. Mueller, 322 F.3d 573, 586 (9th Cir. 2003). First, the state must plead an independent and adequate state procedural bar as an affirmative defense. The burden then shifts to the petitioner "to place that defense in issue," and can be satisfied by "asserting specific factual allegations that

demonstrate the inadequacy of the state procedure, including citation to authority demonstrating inconsistent application of the rule." Id. If the petitioner satisfies his burden, the burden shifts back to the state, which bears "the ultimate burden of proving the adequacy" of the state procedural bar. Id. at 585–86.

Respondent asserts that the state court denied Petitioner's Miranda claim pursuant to an independent and adequate state procedural ground. (ECF No. 14 at 23). In finding that Petitioner failed to preserve his Miranda claim for appeal, the California Court of Appeal relied on California Evidence Code section 353(a), which "allows a judgment to be reversed because of erroneous admission of evidence only if an objection to the evidence or a motion to strike it was 'timely made and so stated as to make clear the specific ground of the objection.'" People v. Demetrulias, 39 Cal. 4th 1, 20 (2006) (quoting Cal. Evid. Code § 353(a)). This state procedural ground is independent as it is not interwoven with federal law. It is also "firmly established" since the statute became effective on January 1, 1967, and codified well-settled California procedural rules. Cal. Evid. Code § 353 cmt. It is also "regularly followed" since the California Supreme Court has recognized that pursuant to this statute, it has "consistently held that the 'defendant's failure to make a timely and specific objection' on the ground asserted on appeal makes that ground not cognizable." People v. Seijas, 36 Cal. 4th 291, 302 (2005) (quoting People v. Green, 27 Cal. 3d 1, 22 (1980)). Petitioner has not raised any challenges to the independence and adequacy of this state procedural ground and thus, has failed to place the defense in issue. Accordingly, the Court finds that the California Court of Appeal applied an independent and adequate state procedural ground, and Petitioner has procedurally defaulted his Miranda claim.

A petitioner may obtain federal review of a defaulted claim by demonstrating either "(1) 'cause for the default and actual prejudice as a result of the alleged violation of federal law,' or (2) 'that failure to consider the claims will result in a fundamental miscarriage of justice.'" Jones v. Ryan, 691 F.3d 1093, 1101 (9th Cir. 2012) (quoting Coleman, 501 U.S. at 750)). As Petitioner has failed to raise the issues of cause and prejudice or a fundamental miscarriage of justice, the Court finds that Petitioner is procedurally barred from bringing his Miranda claim and it should be dismissed.

2.   Ineffective Assistance of Counsel

In his first claim for relief, Petitioner also asserts that counsel was ineffective for failing to preserve his Miranda claim for appeal. (ECF No. 1 at 9). This claim was presented on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. Palomar, 2015 WL 1089544, at *6–8. The claim also was raised in the petition for review, which the California Supreme Court summarily denied. (LDs 6, 7). As federal courts review the last reasoned state court opinion, the Court will "look through" the California Supreme Court's summary denial and examine the decision of the California Court of Appeal. See Brumfield v. Cain, 135 S. Ct. 2269, 2276 (2015); Johnson v. Williams, 133 S. Ct. 1088, 1094 n.1 (2013); Ylst, 501 U.S. at 806.

In denying Petitioner's ineffective assistance claim regarding trial counsel's failure to preserve the Miranda claim for appeal, the California Court of Appeal stated:

> Alternatively, defendant argues his trial counsel rendered ineffective assistance by failing to object.
>
> An ineffective assistance of counsel claim requires a showing that "counsel's action was, objectively considered, both deficient under prevailing professional norms and prejudicial." (*People v. Seaton* (2001) 26 Cal.4th 598, 666, citing *Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland* ).) "[T]he burden is on the defendant to show (1) trial counsel failed to act in the manner to be expected of reasonably competent attorneys acting as diligent advocates and (2) it is reasonably probable that a more favorable determination would have resulted in the absence of counsel's failings." (*People v. Lewis* (1990) 50 Cal.3d 262, 288; see *People v. Weaver* (2001) 26 Cal.4th 876, 961.) This means the defendant "must show both that his counsel's performance was deficient when measured against the standard of a reasonably competent attorney and that counsel's deficient performance resulted in prejudice to [the] defendant in the sense that it 'so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.' [Citations.]" (*People v. Kipp* (1998) 18 Cal.4th 349, 366, quoting *Strickland, supra,* at p. 686.)
>
> As to the first element, an appellate "court will indulge in a presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy. Defendant thus bears the burden of establishing constitutionally inadequate assistance of counsel. [Citations.] If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation. [Citation.]" (*People v. Gray* (2005) 37 Cal.4th 168, 207; see *People v. Scott* (1997) 15 Cal.4th 1188, 1212.)

9

Were we to assume here that defense counsel's performance was deficient because of his failure to object, defendant cannot show he was prejudiced. To do so, he "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland, supra,* 466 U.S. at p. 694.) However, prejudice must be established as " 'a "demonstrable reality," not simply speculation as to the effect of the errors or omissions of counsel.' " (*In re Clark* (1993) 5 Cal.4th 750, 766.)

Defendant contends this case, in the absence of his admissions, was based entirely upon the victim's questionable credibility. Therefore, defendant argues he suffered prejudice by admission of that evidence, entitling him to reversal. We are not swayed.

It is plain the inconsistencies between Jane Doe's trial testimony and the statements she made during the forensic interview shortly after her father's arrest are the result of Jane's wish for her father to come home. Notably, too, Jane was very nervous.

At trial, Jane repeatedly denied any act of oral copulation—she said her father's "middle part" (penis) was never in her mouth. She also testified she did not remember telling the police officer and the forensic interviewer otherwise. At one point, Jane said her mouth "almost" touched her father's middle part, followed immediately by her statement that she doesn't "really remember" and "tried to forget it." Later, Jane claimed her father "pulled" her down and her mouth almost touched his middle part. It happened more than once.

Jane did testify her father touched her breasts and her "middle part" (vagina) on more than one occasion. Jane never wavered from her numerous statements that she told both the police officer and the forensic interviewer the truth. She also testified her father told her not to tell anyone about the touching. Jane never wanted to touch her father and testified she was "grossed out" and "anxious" about what had happened. When she was asked the worst thing that happened when her father abused her, Jane replied, "probably everything that happened."

Officer Rosel testified Jane told him her father had been touching her for the past two years. He touched Jane's breasts and vagina. The officer said at one point Jane told him her father forced her head down toward his middle part and told her to lick it. Jane cried throughout the interview.

Forensic interviewer Josefina Roderick testified at trial. She conducted an interview with Jane Doe in February 2012. The interview was video recorded. Roderick testified the video recording is accurate. It was played for the jury.

Defendant contends the interview "reveals a demeanor that does not provide much confidence in what [Jane] was saying." He notes she was "fidgety and distracted" and appeared to be suffering from a cough and cold. We have reviewed the videotape of Roderick's interview of Jane Doe. Defendant's complaints are not well taken. While the recording does depict an obviously nervous young girl who appears to be suffering the effects of a cold, we find nothing at all to support an inference of a lack of credibility. "A child witness is not a miniature version of an adult witness. Young children think, relate, and communicate in a qualitatively different manner than adults." (Couzens & Bigelow, Sex Crimes: Cal. Law and Procedure (The Rutter Group 2014) § 8.2.)

There was no evidence Jane had a motive to lie about being sexually abused by her father. She testified she loved her dad and she thought they had a good relationship. She missed him and wanted him to come home. In fact, that evidence tends instead to lend support to the inference Jane was motivated to minimize her father's abuse in her testimony at trial. Additionally, as Jane explained, she did not directly report the abuse. Rather, she told her closest friend Breanna. Breanna counseled Jane to tell someone. Jane did not, but Breanna did.

Lastly, we are not persuaded by defendant's assertion that *In re Edward S.* (2009) 173 Cal.App.4th 387 is similar to this case. The claim of ineffective assistance of counsel in *Edward S.* pertained to counsel's failure to investigate potentially exculpatory evidence and the resulting prejudice. Counsel was aware of certain issues bearing on the 10–year–old witness's credibility, including that she "had been exposed to more sexual conduct than most 10–year–olds [and] that on a specific occasion she threatened to lie in order to work her will," a claim that could purportedly be corroborated by more than one individual. (*Id.* at p. 408.) *Edward S.* is unlike this case because here there is no potentially exculpatory evidence at issue, nor are there similar concerns regarding Jane's credibility. Even assuming error on the part of defense counsel, on this record we find any error to be harmless beyond a reasonable doubt.

Palomar, 2015 WL 1089544, at *6–8.

### a. Legal Standard

The clearly established federal law governing ineffective assistance of counsel claims is Strickland v. Washington, 466 U.S. 668 (1984). In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the court must consider two factors. Strickland, 466 U.S. at 687. First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. Id. at 687. The petitioner must show that counsel's representation fell below an objective standard of reasonableness, and must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances. Richter, 562 U.S. at 105 ("The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom.") (citing Strickland, 466 U.S. at 690). Judicial scrutiny of counsel's performance is highly deferential. A court indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Strickland, 466 U.S. at 687. A reviewing court should make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged

1  conduct, and to evaluate the conduct from counsel's perspective at that time." <u>Strickland</u>, 466

2  U.S. at 689.

3      Second, the petitioner must show that there is a reasonable probability that, but for

4  counsel's unprofessional errors, the result would have been different. It is not enough "to show

5  that the errors had some conceivable effect on the outcome of the proceeding." <u>Strickland</u>, 466

6  U.S. at 693. "A reasonable probability is a probability sufficient to undermine confidence in the

7  outcome." <u>Id.</u> at 694. A court "asks whether it is 'reasonable likely' the result would have been

8  different. . . . The likelihood of a different result must be substantial, not just conceivable."

9  <u>Richter</u>, 562 U.S. at 111–12 (citing <u>Strickland</u>, 466 U.S. at 696, 693). A reviewing court may

10 review the prejudice prong first. <u>See</u> <u>Pizzuto v. Arave</u>, 280 F.3d 949, 955 (9th Cir. 2002).

11     Because the <u>Strickland</u> standard is a general standard, a state court has even more latitude

12 to reasonably determine that a defendant has not satisfied that standard. <u>See</u> <u>Yarborough v.</u>

13 <u>Alvarado</u>, 541 U.S. 652, 664 (2004) ("[E]valuating whether a rule application was unreasonable

14 requires considering the rule's specificity. The more general the rule, the more leeway courts

15 have in reaching outcomes in case-by-case determinations."). In effect, review of ineffective

16 assistance of counsel claims under the AEDPA is "'doubly deferential' in order to afford 'both

17 the state court and the defense attorney the benefit of the doubt.'" <u>Woods v. Donald</u>, 135 S. Ct.

18 1372, 1376 (2015) (quoting <u>Burt v. Titlow</u>, 134 S. Ct. 10, 13 (2013)).

19          **b.  Analysis**

20     Petitioner has failed to establish that the state court's determination that Petitioner was

21 not prejudiced by counsel's failure to preserve his <u>Miranda</u> claim for appeal was contrary to, or

22 an unreasonable application of, clearly established federal law, or was based on an unreasonable

23 determination of fact. A "fairminded jurist" could agree with the California Court of Appeal's

24 determination that the victim was credible and that Petitioner failed to demonstrate prejudice

25 from the admission of his statements. It was not objectively unreasonable for the state court to

26 find that the inconsistencies between the victim's trial testimony and her forensic interview were

27 the result of her nervousness and her wish for Petitioner to come home. It also was not

28 objectively unreasonable for the state court to find that there was no evidence the victim had

1  motive to lie about Petitioner's abuse and that the evidence lends support to the inference the

2  victim was motivated to minimize Petitioner's abuse in her testimony at trial. See Wood v. Allen,

3  558 U.S. 290, 301 (2010) ("[E]ven if '[r]easonable minds reviewing the record might disagree'

4  about the finding in question, 'on habeas review that does not suffice to supersede the trial

5  court's . . . determination.'") (second alteration in original) (quoting Rice v. Collins, 546 U.S.

6  333, 341–42 (2006)). In the forensic interview, the victim stated that "[t]here were—like—only

7  two times" she put her mouth on Petitioner's penis. (Supp. CT[6] 65–69). At trial, the victim

8  testified that Petitioner touched her "middle part" and breasts "more than one time." (1 RT[7] 140).

9  (See 1 RT 140–44, 157–58, 161, 170–71; Supp. CT 45, 56–57, 59–61). The victim also testified

10 that Petitioner grabbed her hand and was still holding onto her hand when she touched his

11 "middle part." (2 RT 324–25; Supp. CT 52–54, 62). In light of the victim's trial testimony and

12 statements during the forensic interview, it was not unreasonable for the state court to find that

13 Petitioner failed to show "that there is a reasonable probability that . . . the result of the

14 proceeding would have been different." Strickland, 466 U.S. at 694.

15    Based on the foregoing, the Court finds that the state court's decision denying

16 Petitioner's ineffective assistance of counsel claim was not contrary to, or an unreasonable

17 application of, clearly established federal law, nor was it based on an unreasonable determination

18 of fact. The decision was not "so lacking in justification that there was an error well understood

19 and comprehended in existing law beyond any possibility for fairminded disagreement." Richter,

20 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on his first claim, and it

21 must be denied.

22    **B.  Omission of Unanimity Instruction**

23    In his second claim for relief, Petitioner asserts that the trial court erroneously failed to

24 instruct the jury on unanimity with respect to count 1. (ECF No. 1 at 4). Petitioner contends that

25 there were at least two possible acts on two different occasions for which the jury could have

26 convicted Petitioner of count 1, and that there were sharply different defenses to the two possible

27 [6] "Supp. CT" refers to the Supplemental Clerk's Transcript on Appeal lodged by Respondent on November 25,
2015. (ECF No. 15).

28 [7] "RT" refers to the Reporter's Transcript on Appeal lodged by Respondent on November 25, 2015. (ECF No. 15).

acts. (Id. at 12). Respondent argues that the state court's adjudication was not unreasonable or contrary to Supreme Court precedent because a unanimity instruction is not constitutionally required and the omission was harmless. (ECF No. 14 at 21).

This claim was raised on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned opinion. Palomar, 2015 WL 1089544, at *8–9. The claim was also raised in the petition for review, which was summarily denied by the California Supreme Court. (LDs 6, 7). As federal courts review the last reasoned state court opinion, the Court will "look through" the California Supreme Court's summary denial and examine the decision of the California Court of Appeal. See Brumfield, 135 S. Ct. at 2276; Ylst, 501 U.S. at 806. In denying Petitioner's claim regarding the omission of a unanimity instruction on count 1, the California Court of Appeal stated:

> Defendant maintains the trial court erred in failing to instruct sua sponte on unanimity as to the oral copulation alleged in count 1. He further contends the error requires reversal. Plaintiff concedes the instruction should have been given, however, she claims the error was harmless.
>
> We review a claim of instructional error de novo. (*People v. Manriquez* (2005) 37 Cal.4th 547, 581; *People v. Waidla, supra,* 22 Cal.4th at p. 733.) In a criminal case, a jury verdict must be unanimous. (*People v. Collins* (1976) 17 Cal.3d 687, 693.) The jury must agree unanimously that the defendant is guilty of a specific crime. (*People v. Diedrich* (1982) 31 Cal.3d 263, 281.) "[W]hen the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act." (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.) "The [unanimity] instruction is designed in part to prevent the jury from amalgamating evidence of multiple offenses, no one of which has been proved beyond a reasonable doubt, in order to conclude beyond a reasonable doubt that a defendant must have done *something* sufficient to convict on one count." (*People v. Deletto* (1983) 147 Cal.App.3d 458, 472.) Even if a unanimity instruction is not requested, the trial court has a duty to give the instruction whenever the evidence warrants it. (*People v. Carrera* (1989) 49 Cal.3d 291, 311, fn. 8.)
>
> Count 1 alleged defendant had committed the crime of oral copulation pursuant to section 288.7, subdivision (b). Accordingly, the jury was instructed with CALCRIM No. 1128:
>
>> "The defendant is charged in Count One with engaging in oral copulation with a child 10 years of age or younger.
>>
>> "To prove that the defendant is guilty of this crime, the People must prove that:
>>
>> "1. The defendant engaged in an act of oral copulation with Jane Doe;

"2. When the defendant did so, Jane Doe was 10 years of age or younger;

"3. At the time of the act, the defendant was at least 18 years old.

"Under the law, a person becomes one year older as soon as the first minute of his or her birthday has begun.

"*Oral copulation* is any contact, no matter how slight, between the mouth of one person and the sexual organ or anus of another person. Penetration is not required." (Original italics.)

Moreover, the jury was also instructed regarding the credibility of witnesses, evaluating conflicting evidence, the testimony of a single witness to prove any fact, and conviction of a sexual assault crime can be based solely on the testimony of the complaining witness.

 Even if we assume the trial court erred in failing to sua sponte instruct the jury with a unanimity instruction, any error is harmless beyond a reasonable doubt because the jury clearly believed Jane Doe's testimony. And, the failure to give a unanimity instruction is harmless "if the record indicate[s] the jury resolved the basic credibility dispute against the defendant and would have convicted the defendant of *any* of the various offenses shown by the evidence to have been committed." (*People v. Jones* (1990) 51 Cal.3d 294, 307.)

Despite some conflict between Jane Doe's testimony at trial and the statements she gave during the forensic interview, the record reveals the jury resolved the basic credibility dispute against defendant and would have convicted him of any of the various offenses shown by the evidence to have been committed.

During the forensic interview, Jane said that there "were—like—only two times" that she put her mouth on her father's penis. On one occasion, Jane was taking a shower and her father was in the bathroom with her. He "cleaned his middle thing" with water. Jane did not want to touch it, but he tried to "put [her] head down there so [she] could lick it." Her father told her to look down; Jane did so. Then her mouth was close to her father's penis and he was looking at her and signaling with his eyes for her to lick it. He pushed her head down with his hand. She did not want to lick it. On another occasion, Jane was lying on the floor sleeping and her father had laid down next to her. He directed Jane to slide down so she was facing his "middle thing." He put his hand on her head and told her to open her mouth. He pushed her head and she "licked" his penis. It went in her mouth and it felt "gross." Afterward, Jane got up and brushed her teeth. Her dad told her not to tell anyone. Although Jane's description of these two events—one in the bedroom and one in the bathroom—could be interpreted as describing one completed act of oral copulation because Jane did not explicitly describe her father's penis being inside her mouth in the bathroom incident, she did begin her description of the bedroom and bathroom incidents by saying her father's penis had been in her mouth "two times."

In his statement to detectives, defendant admitted he placed the tip of his penis in Jane's mouth on one occasion. He claimed Jane came into the bathroom while he was taking a shower. He opened the shower curtain and asked her to "do something" for him. She asked "what?" and he signaled what he wanted. He told her to put his penis in her mouth; she touched the tip of his penis with her mouth and then said she did not like it. Defendant admitted also that there were other times he tried to have Jane orally copulate him, but she pulled away on those

other occasions. He told the detectives that he "respected when [Jane] said no." When the detective was summarizing his admissions, defendant again acknowledged his penis went in Jane's mouth on one occasion while they were in the bathroom, and when defendant wanted to put his penis in Jane's mouth on the other occasions, she did not want to so he did not force her to do so.

The jury watched Jane's forensic interview and also heard defendant's statement to the detectives. Both Jane and her father had reason to minimize their respective conduct; she because she loved him and wanted him out of jail and back at home, and he for obvious reasons.

Lastly, we are simply not persuaded by defendant's complaints regarding the interview technique and his interpretations of the interview here. We have reviewed the forensic interview and find no fault.

Following a review of this record, we are satisfied any instructional error was harmless. It is plain the jury resolved any credibility dispute against defendant and convicted him of oral copulation and all other charged sex offenses. (*People v. Jones, supra,* 51 Cal.3d at p. 307.) There is simply no reasonable possibility the verdict would have been different if the jury had been instructed on unanimity. Accordingly, we conclude any error by the trial court for failing to instruct the jury sua sponte with a unanimity instruction pursuant to CALCRIM No. 3500 was harmless beyond a reasonable doubt.

Palomar, 2015 WL 1089544, at *8–9.

Here, the California Court of Appeal found that even assuming the trial court erred by failing to *sua sponte* instruct the jury on unanimity with respect to count 1, any error "was harmless beyond a reasonable doubt." Palomar, 2015 WL 1089544, at *9. The Supreme Court has held that "when a state court determines that a constitutional violation is harmless, a federal court may not award habeas relief under § 2254 unless *the harmlessness determination itself* was unreasonable." Fry v. Pliler, 551 U.S. 112, 119 (2007) (citing Mitchell v. Esparza, 540 U.S. 12 (2003) (per curiam)). A "state-court decision is not unreasonable if 'fairminded jurists could disagree on [its] correctness.'" Davis v. Ayala, 135 S. Ct. 2187, 2199 (2015) (alteration in original) (internal quotation marks omitted) (quoting Richter, 562 U.S. at 101). That is, Petitioner must show that the state court's harmless error determination "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Id. (internal quotation marks omitted) (quoting Richter, 562 U.S. at 103).

In the instant case, the jury was instructed that "[y]ou may believe all, part, or none of any witness's testimony." (CT 159). They were further instructed to "not automatically reject

testimony just because of inconsistencies or conflicts," and "if you think the witness lied about some things, but told the truth about others, you may simply accept the part that you think is true and ignore the rest." (CT 160). In light of the jury's return of guilty verdicts on all counts, it was not objectively unreasonable for the California Court of Appeal to find that the jury resolved the fundamental credibility dispute against Petitioner and would have convicted Petitioner of any of the various offenses shown by the evidence admitted at trial, despite inconsistencies between the victim's trial testimony and her forensic interview and conflicts between the victim's and Petitioner's statements and testimony. There is sufficient evidence in the record from the victim's forensic interview and Petitioner's statements to the detectives that it was not objectively unreasonable for the California Court of Appeal to find no reasonable possibility the verdict would have been different if the jury had been instructed on unanimity. See Henderson v. Kibbe, 431 U.S. 145, 155 (1977) (noting that an omitted jury instruction "is less likely to be prejudicial than a misstatement of the law").

The Court finds that the state court's harmless error determination regarding the omission of the unanimity instruction was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on his second claim and it must be denied.

## C. Sufficiency of Evidence

In his third claim for relief, Petitioner asserts that there was insufficient evidence of force to support his conviction on count 4. (ECF No. 1 at 5). Petitioner contends that the victim testified that Petitioner guided her hand toward him, but when she pulled away he did not resist. (Id. at 15). Respondent argues that the state court's adjudication was not unreasonable or contrary to Supreme Court precedent. (ECF No. 14 at 37). This claim was raised on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned opinion. Palomar, 2015 WL 1089544, at *10–13. The claim was also raised in the petition for review, which was summarily denied by the California Supreme Court. (LDs 6, 7). As federal

courts review the last reasoned state court opinion, the Court will "look through" the California

Supreme Court's summary denial and examine the decision of the California Court of Appeal.

See Brumfield, 135 S. Ct. at 2276; Ylst, 501 U.S. at 806. In denying the sufficiency of evidence

claim, the California Court of Appeal stated:

> [D]efendant contends there was insufficient evidence of force regarding the forcible lewd conduct alleged in count 4. Plaintiff maintains there is substantial evidence supporting the jury's finding.

> In assessing a claim of insufficiency of the evidence, the reviewing court's task is to review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—evidence that is reasonable, credible, and of solid value upon which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence. It is the jury that must be convinced of a defendant's guilt beyond a reasonable doubt. If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment. (*People v. Watkins* (2012) 55 Cal.4th 999, 1019–1020; *People v. Rodriguez* (1999) 20 Cal.4th 1, 11; see *Jackson v. Virginia* (1979) 443 U.S. 307, 317–320; *People v. Johnson* (1980) 26 Cal.3d 557, 578.)

> In reviewing a challenge to the sufficiency of the evidence, appellate courts do not determine the facts. We examine the record as a whole in the light most favorable to the judgment and presume the existence of every fact the trier of fact could reasonably deduce from the evidence in support of the judgment. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) If the verdict is supported by substantial evidence, a reviewing court must accord due deference to the trier of fact and not substitute its evaluation of a witness's credibility for that of the fact finder. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) The testimony of a single witness—unless physically impossible or inherently improbable—is sufficient for a conviction. (Evid.Code, § 411; *People v. Young* (2005) 34 Cal.4th 1149, 1181.) Before the judgment of the trial court can be set aside for insufficiency of the evidence, "it must clearly appear that on no hypothesis whatever is there sufficient substantial evidence to support the verdict of the jury." (*People v. Hicks* (1982) 128 Cal.App.3d 423, 429; see *People v. Conners* (2008) 168 Cal.App.4th 443, 453.)

> Under section 288, subdivision (a), it is a crime to commit a lewd or lascivious act on a child under age 14 with the intent to arouse or satisfy the sexual desires of the perpetrator or the child. Any touch with the requisite sexual intent is a violation of subdivision (a). (*People v. Martinez* (1995) 11 Cal.4th 434, 440–441, 452.) Subdivision (b)(1) of section 288 prohibits the commission of such an act "by use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person." "[T]he force used for a subdivision (b) conviction [must] be 'substantially different from or substantially greater than that necessary to accomplish the lewd act itself.' [Citation.]" (*People v. Soto* (2011) 51 Cal.4th 229, 242.)

> The "force" requirement of section 288, subdivision (b)(1) will be deemed satisfied when the defendant uses any force that is "different from and in excess of the type of force which is used in accomplishing similar lewd acts with a

victim's consent." (*People v. Neel* (1993) 19 Cal.App.4th 1784, 1790.) "According to the majority of courts, this includes acts of grabbing, holding and restraining that occur in conjunction with the lewd acts themselves." (*People v. Alvarez* (2009) 178 Cal.App.4th 999, 1005 [force element met where defendant resisted victim's attempts to push him away, holding victim while digitally penetrating her before grabbing victim's hands and placing them on his penis]; *People v. Babcock* (1993) 14 Cal.App.4th 383, 388 [force element met when defendant grabbed victims' hands and made them touch his genital area].)

Here, during trial, Jane testified her father would sometimes enter the bathroom while she was showering and peek at her through the shower curtain. The following occurred thereafter:

> "[PROSECUTOR] Q After he opens the curtains, what's the next thing that happens?

> "[JANE DOE] A He reaches—he tries to grab me.

> "Q What does he reach with?

> "A His hand.

> "Q And what part of you does he try to grab?

> "A My hand.

> "Q What's the next thing that happens?

> "A Well, he pulls—he pulls me but not that hard.

> "Q When you say he pulls you, could you tell me what part of him he is using and what part of you he is touching?

> "A His hand and my hand.

> "Q What direction does he pull you?

> "A His direction.

> "Q And what's the next thing that happens?

> "A I don't really remember that time.

> "Q Have you ever seen your dad's middle part?

> "A Yes."

Asked about a time she saw her father's middle part, Jane recalled an occasion wherein she was taking a shower and defendant came into the bathroom before work, "unzipped his zipper and took [his middle part] out." Asked whether she had ever touched his middle part, Jane answered affirmatively and said her hand moved because she pulled it away; she wasn't stopped from doing so. Noting that touching had occurred while she was in the shower on more than one occasion, Jane testified she thought her dad wanted her to touch his middle part with her hand on more than one occasion. She touched it with her hand once or twice.

On cross-examination, the following colloquy occurred:

> "[DEFENSE COUNSEL] Q ... You mentioned yesterday that at one point in time I think you said—correct me if I am wrong—but I think you said that there was one time when your dad had grabbed your hand and asked you to—had pulled it towards you and wanted you to touch his middle part; is that right?
>
> "[JANE DOE] A Yes.
>
> "Q And when you say he grabbed your hand, you also said that you were able to pull your hand away?
>
> "A Yes.
>
> "Q Was he holding onto you? Did he grab you and hold onto you real tight?
>
> "A No.
>
> "Q Okay. Was there a lot of pressure on your hand or did he grab your hand or arm?
>
> "A My hand.
>
> "Q Your hand. So if he grabbed your hand like this—
>
> "A Yes.
>
> "[PROSECUTOR]: For the record, counsel's right hand is over the top of his left fingers with the thumbs touching.
>
> "[DEFENSE COUNSEL]: Thank you.
>
> "THE COURT: Yes.
>
> "[DEFENSE COUNSEL]: Q ... So, Jane, he grabbed you by the hand with his hand. Okay. And did he squeeze it tight?
>
> "A No.
>
> "Q And you said that he kind of moved it towards himself, right?
>
> "A Yes.
>
> "Q Moved your hand towards his body?
>
> "A Yes.
>
> "Q And then you pulled your hand away?
>
> "A Yes.
>
> "Q Now, did you pull your hand away before or after you touched his middle part?

"A Before.

"Q All right. Now the time—I think you said there's a time when you actually did touch his middle part, correct?

"A Yes.

"Q Was there one time or more than one time?

"A One time.

"Q And on that time when you touched his middle part, did he grab ahold of your hand at that time?

"A Yes.

"Q He did? Okay. And you didn't—were you able to pull your hand away that time?

"A I don't really remember.

"Q But you did actually touch it?

"A Yes.

"Q Did he still have ahold of your hand? Had he grabbed your hand and was he still holding onto your hand when you touched his middle part?

"A Yes.

"Q And was he holding it tightly?

"A I don't really remember."

During redirect examination, Jane indicated most of the incidents occurred in the shower, and although she was not afraid of her father, she was "grossed out" and anxious about what was happening.

In her forensic interview, Jane spoke about an incident occurring in the shower. Her mother told her to a take a shower because it had been three or four days. While Jane was taking a shower, her dad came into the bathroom. He looked or "peek[ed]" at her. He opened the shower curtain and used his eyes and hands to signal Jane to come closer. Jane leaned away from him; he tried to touch her breasts. Her dad "grabbed" her when she turned. More specifically, Jane said:

"[JANE DOE] A: Um, like—he was, like—elbowing me a little bit closer. He, like, kinda went—well, he grabbed me, like, not before. But kinda grabbed me when, like, when he made—he, like, almost made me touch his middle thing.

"[INTERVIEWER] Q: Okay. How did he—uh—how'd he grab you?

"A: Like, he—he grabbed me but not, like, hard.

"Q: Okay. Where did he grab you?

21

"A: Like, on the hand.

"Q: On what part of the hand?

"A: It was right here.

"Q: Is that just one hand or—or with both hands?

"A: One hand. [¶] ... [¶]

"Q: What did he use to grab your hand?

"A: His hand.

"Q: His hand? Okay. So he grabbed you by the hand and then what?

"A: Like, he tried to make me grab his middle thing.

"Q: He tried to grab you—make you grab his middle thing? How did he try to make you grab his middle thing?

"A: Because he pulled his pants down and, like, take it out. Then I almost touched it. [¶] ... [¶]

"Q: How [did he try to get you to touch his middle thing]?

"A: Like, with my hand. He, like—he—he put his on my hand and then he, like, wanted to, like, touch it.

"Q: Okay. He made you touch it or he made you kinda touch it or what is it that…

"A: He made me, like, kinda touch it.

"Q: He—he made you kinda touch it? What do you mean—mean by kinda touch it.

"A: Like, I touched it but not that much.

"Q: You touched but not that much?

"A: Like the very tip of it."

Jane clarified that her father made her touch his middle part by grabbing her hand and pulling her hand close to his middle part; her hand touched his middle part as a result. Later, the following exchange occurred:

"[INTERVIEWER] Q: ... And so you said he was doing that when he— uh—while you were touching his middle part. Okay. How were you touching his middle part?

"[JANE DOE] A: Like, he made me touch it, though.

"Q: How did he make you touch it?

"A: With his hand, he would put my hand on [ ]his thing.

"Q: He put your hand on his thing? Okay. And so what did you do his—to his thing with your hand?

"A: I—I—like—I grabbed it but I didn't do nothing to it.

"Q: You grabbed it but you didn't do anything with it? Okay. When you grabbed his—um—his thing—his dick—what did he—um—did he still have his hand on yours? Yeah? Okay. And when he—when—um did you move your hand at all? No? Okay...."

In sum, at trial Jane testified defendant grabbed her with his hand while she was in the shower, pulling her toward him. Asked what happened next, Jane said she could not remember. On cross-examination, Jane ultimately testified that on that occasion her father "grabbed [her] hand and was ... still holding onto [her] hand when [she] touched his middle part." Similarly, in the forensic interview, Jane recounted an incident in the shower wherein her father "grabbed" her hand with his hand, putting her hand on the "very tip" of his penis. She later indicated he kept his hand on her hand.

This record contains evidence that is reasonable, credible and of solid value upon which the jury could find defendant used force on at least one occasion to commit a lewd and lascivious act against his daughter. (*People v. Watkins, supra,* 55 Cal.4th at pp. 1019–1020.)

We are not persuaded by defendant's reliance upon *People v. Senior* (1992) 3 Cal.App.4th 765, nor do we agree with defendant that the holdings of *People v. Neel, supra,* 19 Cal.App.4th 1784 and *People v. Bolander* (1994) 23 Cal.App.4th 155 dictate another outcome here. Briefly stated, we agree with the other appellate courts that have rejected *Senior.*

Examining the record as a whole, in the light most favorable to the judgment, we find there is sufficient evidence of force where defendant grabbed Jane Doe's hand with his own and put her hand on his penis. (*People v. Alvarez, supra,* 178 Cal.App.4th at p. 1005; *People v. Kraft, supra,* 23 Cal.4th at p. 1053.) This is simply not a case where a review of the record reveals "that on no hypothesis whatever is there sufficient substantial evidence" to support this jury's finding of guilt on count 4. (*People v. Hicks, supra,* 128 Cal.App.3d at p. 429.) Hence, there is no reason to set aside the judgment.

Palomar, 2015 WL 1089544, at *10–13 (footnote omitted).

The United States Supreme Court has held that when reviewing a sufficiency of the evidence claim, a court must determine whether, viewing the evidence and the inferences to be drawn from it in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). A reviewing court "faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that

1  the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that

2  resolution." Id. at 326. State law provides "for 'the substantive elements of the criminal offense,'

3  but the minimum amount of evidence that the Due Process Clause requires to prove the offense

4  is purely a matter of federal law." Coleman v. Johnson, 132 S. Ct. 2060, 2064 (2012) (quoting

5  Jackson, 443 U.S. at 319).

6       Here, the California Court of Appeal stated that the force requirement of California Penal

7  Code section 288(b)(1) is satisfied when a defendant uses any force, including acts of grabbing

8  and holding that occur in conjunction with the lewd acts themselves, that is different from and in

9  excess of the type of force which is used in accomplishing similar lewd acts with a victim's

10  consent. Palomar, 2015 WL 1089544, at *10. This determination is binding on this Court. See

11  Bradshaw v. Richey, 546 U.S. 74, 76 (2005) ("[A] state court's interpretation of state law,

12  including one announced on direct appeal of the challenged conviction, binds a federal court

13  sitting in habeas corpus.").

14       Viewing the record in the light most favorable to the prosecution, a rational trier of fact

15  could have found true beyond a reasonable doubt that Petitioner used force that is different from

16  and in excess of the type of force which is used in accomplishing similar lewd acts with a

17  victim's consent. As noted by the California Court of Appeal, at trial the victim testified that

18  Petitioner grabbed her hand and was still holding onto her hand when she touched his "middle

19  part." (2 RT 324–25). Additionally, in the forensic interview, the victim stated that Petitioner

20  grabbed her hand, pulled her hand close, and made her touch his "middle thing." (Supp. CT 52–

21  54, 62). Jackson "makes clear that it is the responsibility of the jury—not the court—to decide

22  what conclusions should be drawn from evidence admitted at trial. A reviewing court may set

23  aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact

24  could have agreed with the jury." Cavazos v. Smith, 132 S. Ct. 2, 4 (2011). Under this deferential

25  standard of judicial review, the Court finds that a rational trier of fact could find that Petitioner

26  used force beyond a reasonable doubt. The state court's decision denying Petitioner's sufficiency

27  of evidence claim with respect to use of force was not contrary to, or an unreasonable application

28  of, clearly established federal law. The decision was not "so lacking in justification that there

1   was an error well understood and comprehended in existing law beyond any possibility for

2   fairminded disagreement." <u>Richter</u>, 562 U.S. at 103. Accordingly, Petitioner is not entitled to

3   habeas relief on his third claim, and it must be denied.

4   **D. Application of Amended Sentencing Triad**

5   In his fourth claim for relief, Petitioner asserts that the trial court erroneously applied an

6   amended sentencing scheme with respect to count 4, in violation of the Ex Post Facto Clause and

7   the Sixth Amendment. (ECF No. 1 at 17). Respondent argues that the state court's adjudication

8   was not unreasonable or contrary to Supreme Court precedent. (ECF No. 14 at 46). This claim

9   was raised on direct appeal to the California Court of Appeal, Fifth Appellate District, which

10   denied the claim in a reasoned opinion. <u>Palomar</u>, 2015 WL 1089544, at *13–16. The claim was

11   also raised in the petition for review, which was summarily denied by the California Supreme

12   Court. (LDs 6, 7). As federal courts review the last reasoned state court opinion, the Court will

13   "look through" the California Supreme Court's summary denial and examine the decision of the

14   California Court of Appeal. <u>See</u> <u>Brumfield</u>, 135 S. Ct. at 2276; <u>Ylst</u>, 501 U.S. at 806. In denying

15   Petitioner's *ex post facto* claim, the California Court of Appeal stated:

16
17   Defendant argues the ex post facto clause was violated, as well as his right to have a jury determine every fact required for imposition of a mandatory minimum sentence, when the trial court applied the amended sentencing triad to count 4 in the absence of a jury finding that the conduct occurred before the effective date of the amendment. Plaintiff contends the trial court properly sentenced defendant to an eight-year term on count 4.

18
19
20   More specifically, defendant maintains the court erred because prior to September 9, 2010, a court could impose three, six, or eight years for a conviction of section 288, subdivision (b)(1). Here, when the court imposed the eight-year sentence as the middle or median term, it was referring to the triad in place following the 2010 amendment, to wit: five, eight, or ten years. Defendant contends, because the jury did not make a finding that the crime alleged in count 4 took place on or after September 9, 2010, the eight-year sentence cannot be imposed because the jury could have convicted defendant for crimes committed prior to the 2010 amendment. We hold to the contrary.

21
22
23
24   *A. The Pertinent Law*

25
26   "The United States Constitution and the California Constitution proscribe ex post facto laws. (U.S. Const., art. I, § 10; Cal. Const., art. I, § 9.) Both constitutions protect against the later adoption of a statute that inflicts greater punishment than the law in effect at the time of the commission of the crime. (*Collins v. Youngblood* (1990) 497 U.S. 37, 42–43; *People v.*

27
28

25

*Grant* (1999) 20 Cal.4th 150, 158.)" (*People v. Riskin* (2006) 143 Cal.App.4th 234, 244.)

"[I]t is the prosecution's responsibility to prove to the jury that the charged offenses occurred on or after the effective date of the statute providing for the defendant's punishment. When the evidence at trial does not establish that fact, the defendant is entitled to be sentenced under the formerly applicable statutes even if he raised no objection in the trial court." (*People v. Hiscox* (2006) 136 Cal.App.4th 253, 256.)

An ex post facto violation resulting in an unauthorized sentence may be raised on appeal even if the defendant failed to object below and may be corrected at any time. (*People v. Dotson* (1997) 16 Cal.4th 547, 554, fn. 6.)

### B. The Relevant Proceedings Below

In the second amended information, count 4 was alleged as follows:

"For a further and separate cause of action, being a different offense of the same class of crimes and offenses as the charge set forth above, the said defendant(s) ... did, on or about and between February 23, 2011 and February 13, 2012, in the County of Madera, State of California, commit a FELONY, namely, violation of Section 288(b)(1) of the Penal Code of the State of California, in that the said defendant did willfully, unlawfully, and lewdly commit a lewd and lascivious act upon and with the body and certain parts and members thereof of Jane Doe, a child under the age of fourteen years, with the intent of arousing, appealing to, and gratifying the lust, passions, and sexual desires of the said defendant and the said child, by use of force, violence, duress, menace, and threat of great bodily harm, when defendant grabbed Jane Doe's hand and forced her to touch his penis."

The dates alleged in the operative information correspond with Jane's 10th birthday and the date of defendant's interview with detectives.

The jury's verdict found defendant guilty of Penal Code section 288, subdivision (b)(1) "as charged in Count Four of the Information on file herein."

At the sentencing hearing, after defendant and Jane's mother addressed the court and after counsel argued their respective positions regarding an appropriate sentence, the court sentenced defendant as follows:

"[THE COURT:] So [defendant], in this matter you are sadly mistaken. I listened to the evidence in this trial and I listened to your daughter and it— she didn't want to be up here. It was clear that she did not want to have to testify against her father. And I believed that much more happened than she testified to given your statement to the police and given the statement that she gave at the time to—pursuant to the interview that she had given. In addition, I find your testimony about what the officers did absolutely ludicrous. I have no sympathy for you. I have tremendous sympathy for [Jane Doe's mother] and her daughters. You have destroyed their lives. You had a great life with them. And you just destroyed it. So in this matter probation is denied pursuant to Penal Code Section 1203.065, Subdivision (a)....

"As to Count 2, a felony violation of Section 288, Subdivision (a), Court imposes the median term of 6 years, deems that the principal term. As to Count 3, a felony violation of Section 288, Subdivision (a) of the Penal Code, Court imposes two years State Prison, which is ... one third of the median term of 6 years. That's imposed consecutive pursuant to Section 1170.1 Subdivision (a) and deemed a subordinate term.

"As to Count 4, a felony violation of Section 288, Subdivision (b)(1) of the Penal Code, Court imposes 8 years State Prison, median term. And that's imposed full separate and consecutive pursuant to Penal Code Section 667.6, Subdivision (d). Aggregate term of the determinate term is 16 years in State Prison. Pursuant to Penal Code Section 669, the determinate term is to be served prior to the indeterminate term imposed in Count 1 and the determinate term is consecutive to each other and consecutive to the indeterminate term which will be imposed in Count 1. As to Count 1, a felony violation of Section 288.7, Subdivision (b) of the Penal Code, Court imposes 15 years to life—to life in State Prison, consecutive. The aggregate term of the indeterminate term is 15 years to life in prison."

### C. Our Analysis

We find no ex post facto violation here. The operative information specifically alleged defendant had committed a violation of section 288, subdivision (b)(1) between February 23, 2011 and February 13, 2012. The relevant amendment to section 288 occurred September 9, 2010. More than five months passed between the date the statutory amendment took effect and the earliest date alleged in the information. Defendant argues the five-month period is "reasonably close" to the date of amendment and thus the jury should have made a finding that the violation took place on or after September 9, 2010. We do not agree.

Although the record does include Officer Rosel's testimony that Jane told him defendant began molesting her when she was seven or eight years old—possibly implicating the September 2010 amendment—the record also properly includes defendant's statement to detectives. In that statement, defendant denies touching Jane when she was seven or eight years old. The first time he touched Jane was eight or ten months prior to the interview. On that occasion, he touched her breasts over her clothing because he said she had complained of pain. Six or seven months prior to the interview he touched her breasts and her vagina; Jane was not clothed. Defendant agreed with the detective's assessment that he started out with good intentions (8–10 months prior to interview) then became aroused by the contact with Jane and it led to more. The first time defendant touched Jane's vagina was six months prior to the interview and he had done so three times since. Further, defendant indicated his penis touched Jane's vagina "only" two or three times. On one occasion, defendant indicated his penis was in his daughter's mouth. Defendant explicitly indicated he began touching Jane "a little after [she turned] 10 years old" and that he had been touching her for less than a year at the time of his interview. Finally, defendant was asked when he last touched his daughter and he indicated it had been about a week prior to his arrest or "last Wednesday."

We recognize that Jane testified she did not remember how old she was when her father began touching her. On cross-examination, Jane was asked whether she remembered "when these things happened," and she replied, "No, I tried to forget it this whole year." Jane's testimony was vague as to any date and/or her age at

the time the offenses were being committed. She testified frequently that the various touchings happened more than one time. Jane told her friend Breanna first and believed it was about a month later that police came to speak with her.

We agree with the People that defendant's reliance upon our decision in *People v. Riskin, supra,* 143 Cal.App.4th 234 is misplaced. In *Riskin,* the amendment at issue occurred during the relevant charging period. In other words, Riskin was alleged to have committed certain crimes between June 1994 and June 1998; the one strike law was enacted in November 1994. However, as noted above, the charging period specifically alleged here is February 23, 2011, through February 13, 2012. (E.g., *People v. Hiscox, supra,* 136 Cal.App.4th at pp. 257–258 [11 counts alleged over " 'years of 1992 through 1996' " where the one strike law took effect Nov. 30, 1994].)

In conclusion, this is not a case where the information alleged various acts were committed during a particular time period and within that identifiable time period the relevant statute was amended, thereby increasing the potential punishment. Rather, here, the information alleged the acts had occurred between the time Jane turned 10 years of age until the date of defendant's interview with detectives. Jane's trial testimony and forensic interview do not shed light on the relevant dates associated with the molestations she disclosed. Nevertheless, in defendant's statement to detectives—wherein he acknowledges very similar conduct to that which Jane testified—he expressly denied touching Jane before she turned 10 years old. As a result, unlike the authorities upon which defendant relies, there was no ex post facto violation here. Lastly, because we find no ex post fact violation, we do not address defendant's related Sixth Amendment argument.

<u>Palomar</u>, 2015 WL 1089544, at *13–16 (footnotes omitted).

"The Constitution prohibits both federal and state governments from enacting any '*ex post facto* Law.'" <u>Peugh v. United States</u>, 133 S. Ct. 2072, 2081 (2013) (quoting U.S. Const., art. I, §§ 9, 10). One category of *ex post facto* law includes "[e]very law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed." <u>Id.</u> (quoting <u>Calder v. Bull</u>, 3 U.S. 386, 390 (1798) (opinion of Chase, J.)). The statute at issue here is California Penal Code section 288(b)(1). Before September 9, 2010, a former version of section 288(b)(1) imposed a determinate sentencing range of three, six, or eight years for forcible lewd conduct. Cal. Penal Code § 288(b)(1) (2009). On September 9, 2010, the sentencing range increased to five, eight, or ten years. Cal. Penal Code § 288(b)(1) (2010). <u>See</u> <u>People v. Soto</u>, 51 Cal. 4th 229, 237 n.4 (2011). In the instant case, the second amended information alleged in count 4 that on or about and between February 23, 2011, and February 13, 2012, Petitioner committed a lewd and lascivious act upon a child under the age of fourteen years by use of force, violence, duress, menace, or threat of great bodily harm. (CT 89).

1    The jury found Petitioner guilty *as charged* in count 4 of the information. (CT 122).

2          The California Court of Appeal acknowledged that at trial there was testimony that the

3    victim told an officer that Petitioner began molesting her when she was seven or eight years old,

4    which would have occurred before the September 2010 amendment. (2 RT 340). However, the

5    court also recognized that the victim's testimony was inconclusive as to any date and her age at

6    the time the offenses were committed. Further, Petitioner explicitly stated to detectives that he

7    did not touch the victim before she turned ten years old. (Supp. CT 29–30). The information

8    alleged the offense was committed between the time the victim turned ten years old and the date

9    of Petitioner's statement to detectives. The amendment to the sentencing scheme occurred before

10   the time period alleged in the information. Thus, the Court finds that the state court's decision

11   denying Petitioner's *ex post facto* claim was not contrary to, or an unreasonable application of,

12   clearly established federal law, nor was it based on an unreasonable determination of fact. The

13   decision was not "so lacking in justification that there was an error well understood and

14   comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562

15   U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on his fourth claim, and it

16   must be denied.

17          **E.  Exclusion of Defense Counsel's Visual Aid**

18          In his fifth claim for relief, Petitioner asserts that the trial court erroneously prohibited

19   defense counsel from using a visual aid during closing argument. (ECF No. 1 at 20). Respondent

20   argues that the state court's adjudication was not unreasonable or contrary to Supreme Court

21   precedent. (ECF No. 14 at 53). This claim was raised on direct appeal to the California Court of

22   Appeal, Fifth Appellate District, which denied the claim in a reasoned opinion. Palomar, 2015

23   WL 1089544, at *16–18. The claim was also raised in the petition for review, which was

24   summarily denied by the California Supreme Court. (LDs 6, 7). As federal courts review the last

25   reasoned state court opinion, the Court will "look through" the California Supreme Court's

26   summary denial and examine the decision of the California Court of Appeal. See Brumfield, 135

27   S. Ct. at 2276; Ylst, 501 U.S. at 806.

28   ///

29

In denying this claim, the California Court of Appeal stated:

Defendant contends it was error for the trial court to refuse defense counsel's request to use a chart illustrating the concept of reasonable doubt during closing argument. The People contend the trial court properly denied the request to use a visual aid illustrating the burden.

After the defense rested and before the jury was instructed prior to deliberations, the record contains the following:

> "[DEFENSE COUNSEL]: We had some off the record discussions regarding a demonstrative evidence not—strike that. Demonstrative tool for argument which the Court and the people objected to. The Court has ruled inadmissible, and I just want to place that on the record.

> "THE COURT: I hadn't ruled inadmissible but I will—it seems to try and define beyond a reasonable doubt inappropriately, so I am not going to allow it."

The demonstrative tool in question was made a part of the record on appeal by way of augmentation ordered August 20, 2013. Referred to as "Exhibit B," the proffered graph is depicted as follows:



The trial court has the authority and duty to control proceedings during trial and may limit the introduction of evidence and argument of counsel. (Pen.Code, § 1044; *People v. Carpenter* (1997) 15 Cal.4th 312, 397.) Absent a patent abuse of discretion, the trial court's decision under section 1044 will be upheld on appeal. (*People v. Cline* (1998) 60 Cal.App.4th 1327, 1334.) We see no abuse of discretion.

"Advocates are given significant leeway in discussing the legal and factual merits of a case during argument. [Citation.] However, 'it is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its ... obligation to overcome reasonable doubt on all elements [citation].' [Citations.]" (*People v. Centeno* (2014) 60 Cal.4th 659, 666.) Similarly, we believe it would have been improper for the trial court to permit defense counsel to use the chart illustrated above because it misstates the law generally.

Nontraditional explanations of the phrase "beyond a reasonable doubt" have generally been discouraged. (*People v. Medina* (1995) 11 Cal.4th 694, 745.)

"The case law is replete with innovative but ill-fated attempts to explain the reasonable doubt standard. (See *People v. Johnson* (2004) 119 Cal.App.4th 976, 985–986; *People v. Garcia* (1975) 54 Cal.App.3d 61, 63.) We have recognized the 'difficulty and peril inherent in such a task,' and have discouraged such ' "experiments" ' by courts and prosecutors. (*Medina, supra,* 11 Cal.4th at p. 745.)" (*People v. Centeno, supra,* 60 Cal.4th at p. 667.)

The jury was instructed as to the accepted reasonable doubt standard:

"The fact that a criminal charge has been filed against the defendant is not evidence that the charge is true. You must not be biased against the defendant just because he has been arrested, charged with a crime, or brought to trial.

"A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt unless I specifically tell you otherwise.

"Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt.

"In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty."

Defense counsel's request was viewed as inappropriate by the trial court. It considered the chart or visual aid as one that would experiment or tinker with the accepted definition of reasonable doubt found in CALCRIM No. 220. It could also have served to mislead or confuse the jury.

We acknowledge that "not all visual aids are suspect [and that the] use of charts, diagrams, lists, and comparisons *based on the evidence* may be effectively and fairly used in argument to help the jury analyze the case." (*People v. Centeno, supra,* 60 Cal.4th at p. 671.) Here, however, the chart illustrated above is not one based on evidence that would have effectively or fairly assisted the jury in analyzing the case.

In a supplemental brief dated April 30, 2014, defendant asks that we consider a then very recent holding of the Ninth Circuit Court of Appeals entitled *Frost v. van Boening* (9th Cir.2014) 757 F.3d 910, wherein the federal circuit court ruled it was reversible, structural error to prohibit defense counsel from using a visual aid in summation regarding the burden of proof. Nevertheless, in late 2014, the United States Supreme Court reversed the Ninth Circuit's decision in *Glebe v. Frost* (2014) —— U.S. —— [135 S.Ct. 429]. The high court held that even assuming its prior decision in *Herring v. New York* (1975) 422 U.S. 853 "established that complete denial of summation amounts to structural error, it did not clearly establish that the restriction of summation also amounts to structural error." (*Glebe v. Frost, supra,* 135 S.Ct. at p. 431, italics omitted.) It also held that the Ninth Circuit erred because it went "much too far to suggest that our cases clearly establish that this supposed extraction of a 'taci[t] admi[ssion]' is structural error." (*Id.* at pp. 431–432.)

Defendant's supplemental brief also argued that apart from the question of whether the error was structural, *Frost v. van Boening* "illustrates the significance of the type of error in this case, which goes to the heart of reasonable doubt." Initially, we note the obvious—that in light of *Glebe v. Frost, Frost v. van Boening* is no longer viable legal authority. Additionally, we note "[d]ecisions of the lower federal courts interpreting federal law, though persuasive, are not binding on state courts." (*Raven v. Deukmejian* (1990) 52 Cal.3d 336, 352.) In any event, we find *Frost v. van Boening* distinguishable. Defense counsel was not denied the ability to argue whether the People had met their required burden of proving the crimes alleged beyond a reasonable doubt. Rather, defendant was merely restricted from using a visual aid to make his arguments to the jury.

In the main, we assign no error to the trial court's ruling that defense counsel was prohibited from using a visual aid concerning the concept of reasonable doubt.

Palomar, 2015 WL 1089544, at *16–18 (footnote omitted).

"[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" Crane v. Kentucky, 476 U.S. 683, 690 (1986) (quoting California v. Trombetta, 467 U.S. 479, 485 (1984)). Further, "[t]he right to effective assistance of counsel extends to closing arguments." Yarborough v. Gentry, 540 U.S. 1, 4 (2003). The Supreme Court case implicated by Petitioner's claim is Herring v. New York, 422 U.S. 853 (1975). In Herring, the Supreme Court held that a state statute, which allowed judges in a nonjury criminal trial to deny counsel any opportunity to make a closing summation before rendition of judgment, violated the right to assistance of counsel. Id. at 865. See also Glebe v. Frost, 135 S. Ct. 429, 431 (2014). Importantly, however, Herring recognized that the right to assistance of counsel is not unlimited and a court "must be and is given great latitude in . . . limiting the scope of closing summations . . . [to] ensure that argument does not stray unduly from the mark, or otherwise impede the fair and orderly conduct of the trial." Herring, 422 U.S. at 862.

1    The Court finds <u>United States v. Doe</u>, 705 F.3d 1134 (9th Cir. 2013), instructive.[8] In <u>Doe</u>,

2    the defendant argued that he was deprived of his Sixth Amendment right to counsel because the

3    defense was prevented from arguing during closing argument that the government had the

4    burden of disproving the defendant's public authority defense beyond a reasonable doubt. <u>Id.</u> at

5    1149. Applying <u>Herring</u>, the Ninth Circuit found no error because the trial court "did not forbid

6    Doe from making a closing argument or from presenting his public authority theory; it merely

7    prevented him from arguing incorrect statements of law, something that is well within the court's

8    discretion." <u>Id.</u> Similarly, here, defense counsel was not prevented from making a closing

9    argument or from arguing that it was the prosecution's burden to prove guilt beyond a reasonable

10   doubt. The jury was given instruction regarding the prosecution's burden and the definition of

11   reasonable doubt. (CT 156–57). The trial court merely prevented the defense from using a visual

12   aid that did not precisely reflect the accepted definition of reasonable doubt.

13   The Court finds that the state court's rejection of Petitioner's challenge to the prohibition

14   of the defense's use of a visual aid during closing arguments was not contrary to, or an

15   unreasonable application of, clearly established federal law. The decision was not "so lacking in

16   justification that there was an error well understood and comprehended in existing law beyond

17   any possibility for fairminded disagreement." <u>Richter</u>, 562 U.S. at 103. Accordingly, Petitioner is

18   not entitled to habeas relief on his fifth claim, and it must be denied.

19                                                    **IV.**

20                                      **RECOMMENDATION**

21   Accordingly, the Court HEREBY RECOMMENDS that the petition for writ of habeas

22   corpus be DENIED.

23   This Findings and Recommendation is submitted to the assigned United States District

24   Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local

25   Rules of Practice for the United States District Court, Eastern District of California. Within

---

[8] "Although circuit caselaw is not governing law under AEDPA, [the Court] may look to circuit precedent in determining what law is clearly established." <u>Byrd v. Lewis</u>, 566 F.3d 855, 860 n.5 (9th Cir. 2009) (citing <u>Duhaime v. Ducharme</u>, 200 F.3d 597, 600–01 (9th Cir. 2000)). In addition, Ninth Circuit "precedents may be pertinent to the extent that they illuminate the meaning and application of Supreme Court precedents." <u>Campbell v. Rice</u>, 408 F.3d 116, 1170 (9th Cir. 2005) (en banc).

**THIRTY (30) days** after service of the Findings and Recommendation, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within fourteen (14) days after service of the objections. The assigned District Judge will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **August 1, 2016**

UNITED STATES MAGISTRATE JUDGE

34